BOSTON HARBOR COMMUTER SERVICE, INC. *VS.*
MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
& another.[1]

No. 97-P-1587.

Suffolk. November 5, 1998. - January 11, 1999.

Present: KASS, GILLERMAN, & BECK, JJ.

*Injunction. Contract,* Bidding for contract.

In an action brought by an unsuccessful bidder, seeking an injunction prohibit-
ing the performance of a service contract that had been the subject of the
bidding, a judge of the Superior Court correctly denied injunctive relief
where, on the documentary evidence before him, the judge was warranted
in concluding that the winning bid conformed to the bid specifications, that
the award was not made arbitrarily or capriciously, and that the party seek-
ing the injunction had not demonstrated a likelihood of success on the
merits. [125-126]

CIVIL ACTION commenced in the Superior Court Department on
June 24, 1997.

The case was heard by *Allan vanGestel,* J.

*Kevin F. Moloney* (*Roger T. Manwaring* with him) for the
plaintiff.

*Jonathan P. Feltner* (*Mary M. Logalbo* with him) for Mas-
sachusetts Bay Transportation Authority.

*Joel Lewin* for Harbor Cruises, LLC.

KASS, J. In response to an invitation for bids from the Mas-
sachusetts Bay Transportation Authority (MBTA) to provide
commuter boat service between Rowe's Wharf in Boston and
Hewitt's Cove in Hingham, Harbor Cruises, LLC (Harbor
Cruises), offered to provide the service for five years at a price
of $4,951,587. Boston Harbor Commuter Service, Inc. (Com-
muter Service) bid a five-year price of $10,500,000 — i.e.,
$5,548,413 higher than the bid of Harbor Cruises. Commuter

---

[1]Harbor Cruises, LLC.

Service protested to MBTA that Harbor Cruises's spectacularly lower bid was nonresponsive and that Commuter Service was entitled to the award. MBTA rejected the protest and on June 5, 1997, awarded the contract to Harbor Cruises. On July 1, 1997, Harbor Cruises began to run the Boston-Hingham service. This appeal is from a failed attempt by Commuter Service to obtain a preliminary injunction against performance of Harbor Cruises's contract with MBTA.

We affirm the denial by a Superior Court judge of the request for a preliminary injunction. *First*, we come to that decision by application of the restrained standard of review under which an appellate court examines the denial or grant of preliminary injunctive relief. At the preliminary injunction stage, an appellate court will not reverse the action of the motion judge if there is a supportable legal basis for that action. *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 615-616 (1980). *Westinghouse Bdcst. Co.* v. *New England Patriots Football Club, Inc.*, 10 Mass. App. Ct. 70, 75 (1980). *New England Patriots Football Club, Inc.* v. *University of Colo.*, 592 F.2d 1196, 1200 (1st Cir. 1979). This is not to say that the appellate court infallibly rubber stamps what the motion judge has done. Particularly when the record consists entirely of documentary evidence, the appellate court may draw its own conclusions, but the posture is still one of a measure of deference. *Commonwealth* v. *Mass. CRINC*, 392 Mass. 79, 87 (1984). *Second*, we conclude that Harbor Cruises's bid was responsive to MBTA's specifications and that the essence of Commuter Service's protest, upon examination, is not that Harbor Cruises failed to respond to the bid specifications, but rather that it could not perform in accordance with its response; Harbor Cruises, its rival insists, could not perform because it did not have the tools to do the job.

1. *History of the litigation.* Following award of the contract by MBTA to Harbor Cruises on June 5, 1997, events moved swiftly. MBTA gave Harbor Cruises a notice to proceed on June 10 and executed a contract with Harbor Cruises on June 18, by which time Commuter Service had (on June 16) logged in at the MBTA a protest of the bid award. On June 19, MBTA rejected the bid protest. Commuter Service that day appealed to MBTA's general counsel, who denied the appeal on June 23. On the very next day, Commuter Service filed its complaint with the Superior Court, asking, among other remedies, for a

124          46 Mass. App. Ct. 122 (1999)

Boston Harbor Commuter Service, Inc. *v.* Massachusetts Bay Transportation Authy.

preliminary injunction to prevent performance of the contract between MBTA and Harbor Cruises. That contract, as noted above, was for five years, i.e., through June 30, 2002. Commuter Service had made the Boston-Hingham run during the previous five years at a price in the neighborhood of $5,000,000, a figure much resembling the winning low bid of Harbor Cruises in 1997.

With admirable dispatch, a Superior Court judge on June 30, 1997, considered and denied the motion for a preliminary injunction. In so doing, he observed that there were sharply conflicting claims about the ability of Harbor Cruises to provide ships with the speed and passenger accommodations promised in its bid response. Those facts the judge could not resolve on the basis of the hand-tailored affidavits that the contending parties submitted. On the record before him, the judge did not see indicia of arbitrary and capricious conduct by MBTA. He, thus, saw no likelihood of success for Commuter Service. Should it turn out that Harbor Cruises could not perform as it had promised, the judge observed, both the public and MBTA would know soon enough. Commuter Service was not successful in obtaining relief from a single justice of the Appeals Court under G. L. c. 231, § 118, first par., and took an appeal under the second paragraph of § 118. The record reflects no effort by Commuter Service to obtain a speedy trial on the merits.

At the time of argument of this case before us, Harbor Cruises had been performing the Boston-Hingham service contract for a year and one-half. With the advantage of a retrospective look, the ability of Harbor Cruises to produce the requisite equipment is not in doubt. That point came up in oral argument before us. We think that Commuter Service is right that our duty is to look at the bids as of the time they were submitted. If we determined the bid of Harbor Cruises to be materially deficient, we suppose we would be bound to order — although we reserve the point — that Harbor Cruises be enjoined from continuing performance of the contract. Cf. *Amdahl Corp.* v. *Bureau of Sys. Policy & Planning*, 26 Mass. App. Ct. 991, 996 (1988). A service contract differs from a construction contract in that construction work becomes fixed in place, the award cannot practically be undone, and the remedy of the wronged bidder is limited to the costs attendant on making the bid. See *Paul Sardella Constr. Co.* v. *Braintree Hous. Authy.*, 3 Mass. App. Ct. 326, 333-335 (1975), *S.C.*, 371 Mass. 235, 243 (1976); *E. Amanti & Sons, Inc.* v. *Barnstable*, 42 Mass. App. Ct. 773, 778 (1997).

2. *Whether the Harbor Cruises bid was responsive.* MBTA had set up a two-phase bidding process. In the first phase, contestants were to establish that they were qualified bidders by submitting descriptions of the vessels that they either owned or could secure control of for purposes of operating the Boston-Hingham sailings. Bidders were required to submit, among other things, resumes of key management personnel, references, and a list of all transportation contracts performed within the previous five years. Most particularly, bidders were to show that they had at their disposal two 150-passenger vessels, two 300-passenger vessels, one 200-passenger vessel (or two ships that in the aggregate could carry 200 passengers), and one 150-passenger back-up vessel. Needless to say, these ships were to be in compliance with Coast Guard requirements. Among additional requirements were that the vessels were to be equipped to tie down wheelchair passengers, to make the trip in thirty-five minutes under normal conditions, and to be able to accommodate passengers in heated areas.

There were only two Phase I bidders. MBTA's selection committee qualified both to make the Phase II price bids. In that qualification review, MBTA had the assistance of Childs Engineering Corporation (Childs) as an outside consultant. Childs vetted the submissions and the vessels themselves, although one gathers that Childs did not get to checking out all the vessels of the two bidders before MBTA declared both Commuter Service and Harbor Cruises to be qualified bidders. Commuter Service did not protest the prequalification of its rival until it had been outbid by Harbor Cruises in Phase II of the contest, but we do not make too much of this. There were only thirteen days between the submission of the Phase I bids and the opening of the Phase II bids on June 2, 1997.

Although Commuter Service listed in its complaint eleven ways in which Harbor Cruises was unqualified, those claimed shortcomings may be distilled to three: (1) some of the ships in Harbor Cruises's designated fleet could not make the trip in thirty-five minutes or less; (2) not all the ships in the designated fleet accommodated all passengers in heated interior areas; and (3) not all the ships were in the control — owned, leased, or under option — of Harbor Cruises. Whether those deficiencies existed was not, so we learn from the record, a matter of uncontestable objective fact at the preliminary injunction stage of the proceedings. Harbor Cruises maintained that all its vessels could

run at the required speed in normal operating conditions or could achieve it through engine adjustments easily made. MBTA had satisfied itself through physical inspection of Harbor Cruises's vessels and review of deck plans for vessels not in the New England area that there were sufficient inside heated areas.[2] As for dominion over all proposed vessels, both bidders had elements of contingency as to one or two of their designated vessels but also had standby plans to acquire or lease substitute craft. Qualification by MBTA of both Commuter Service and Harbor Cruises was, therefore, a reasonable decision by the awarding authority, which brought a measure of knowledge and experience to the task of assessing the qualifications of the bidders. See *Capuano, Inc.* v. *School Bldg. Comm. of Wilbraham,* 330 Mass. 494, 496 (1953). Contrast *Modern Continental Constr. Co.* v. *Lowell,* 391 Mass. 829, 834, 840 (1984), in which the awarding authority unlawfully waived a prequalification procedure required by statute. Having determined that Harbor Cruises had the personnel, organization, and equipment to provide the service called for, MBTA was not bound to anticipate failure by Harbor Cruises. It is not unusual for a contracting party to commit itself to performance that will require some tooling up by the obligor. See *Rizika* v. *Donovan,* 45 Mass. App. Ct. 159, 163-164 (1998).

On the basis of the documentary evidence before him, the judge was entirely warranted in concluding that the bid of Harbor Cruises conformed to MBTA's specifications and that the claim of Commuter Service that Harbor Cruises had misrepresented its qualifications could not be adjudicated at the preliminary injunction phase. The prospects of Commuter Service on the merits were bleak, and as there was no showing that the public was not adequately served by the award to Harbor Cruises, the judge was correct in refusing a preliminary injunction. *Packaging Indus. Group, Inc.* v. *Cheney,* 380 Mass. at 615-616. Coupled with the deferential approach with which we review the denial or grant of a preliminary injunction, we affirm the denial of preliminary injunctive relief.

*Order denying preliminary injunction affirmed.*

[2]On July 1, when the service was to begin, there was plenty of time to bring heating equipment to performance standards.